1998 ND 46

Larry HANNEMAN and Linda Hanneman, individually, and Linda Hanneman as Personal Representative of the Estate of Dawn Marie Hanneman, Plaintiffs and Appellants,

v.

CONTINENTAL WESTERN INSUR-ANCE COMPANY, Defendant, Appellee and Cross–Appellee,

and

Lee G. Kurry, Defendant, Appellee and Cross–Appellant.

Civil No. 970179.

Supreme Court of North Dakota.

March 5, 1998.

Bryan L. Van Grinsven (argued) and Steven C. Lian, Farhart, Lian, Maxson, Louser & Zent, P.C., Minot, for plaintiffs and appellants.

Thomas O. Smith (argued) and Lawrence E. King, Zuger Kirmis & Smith, Bismarck, for defendant, appellee, and cross-appellee Continental Western Ins. Co.

Michael J. Hagburg (argued) and Randall J. Bakke, Smith Bakke Hovland & Oppegard, Bismarck, for defendant, appellee, and cross-appellant Lee G. Kurry.

VANDE WALLE, Chief Justice.

[¶ 1] Larry and Linda Hanneman, individually, Linda Hanneman as Personal Representative of the Estate of Dawn Marie Hanneman, and Lee G. Kurry appealed the Judgment of the Ward County District Court entered after an order for declaratory relief in favor of Continental Western Insurance Company. We affirm.

I

[¶ 2] On July 15, 1995, Dawn Hanneman and her friend Tracy Marchant drove to a street dance in Granville, North Dakota. The two traveled in Dawn Hanneman's 1993 Pontiac Grand Prix. Lee Kurry was also at the street dance but arrived separately with some friends. Kurry did not drive his own vehicle to Granville.

[¶ 3] Dawn Hanneman and Kurry were acquaintances. They saw each other that night at the Branding Iron Bar in Granville. After spending about 45 minutes with Dawn Hanneman, Kurry left the Branding Iron and went across the street to the Sore Thumb, another bar in Granville. After midnight Dawn Hanneman and Kurry met again at the Branding Iron. They decided to attend an after-the-bar party at Buffalo Lodge Lake. Believing she was too intoxicated to drive, Dawn Hanneman asked Kurry to drive her Grand Prix.

[¶ 4] Dawn Hanneman's friend, Tracy Marchant, wanted to go home. So the three drove to Marchant's home in Surrey, North Dakota, where she was dropped off.

[¶ 5] After dropping off Marchant at her home, Kurry and Dawn Hanneman proceeded to Kurry's home in Surrey "to see what [he] had to drink...." Kurry grabbed a partially filled fifth of Tequila, plastic cups, and a "fuzz buster." Kurry then drove to a convenience store to purchase some orange juice as a drink mix. Kurry drove Dawn Hanneman in her Grand Prix to the Buffalo Lodge Lake party. Kurry was unfamiliar with the area and received directions from Dawn.

[¶ 6] The two left the party at around 4:30 in the morning with Kurry again behind the wheel. Kurry took a wrong turn while leaving Buffalo Lodge Lake, and ultimately drove on a paved road he thought was U.S. Highway 2 West. Actually, Kurry and Dawn Hanneman were traveling on a paved county road north of Granville. They came to a "T" in the road. The car continued through the paved intersection onto a gravel road. Kurry lost control of the vehicle and although the gravel road curved, the vehicle failed to negotiate the curve and vaulted 47 feet through the air striking the back-slope of the ditch where it became airborne. The vehicle finally came to rest upside down on the far bank of a small creek.

[¶ 7] Dawn Hanneman was pronounced dead at the scene.

[¶ 8] Larry and Linda Hanneman, individually, and Linda Hanneman as Personal Representative of the Estate of Dawn Marie Hanneman, filed a wrongful death action against Lee Kurry. Ohio Casualty Insurance Company, the Hannemans' insurance carrier, defended Kurry in the wrongful death action.

[¶ 9] Kurry had a commercial auto policy with Continental Western Insurance Company. The named insured under the Continental policy was Lee Kurry doing business as Decorators Unlimited. The policy provided liability coverage for "all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto'."

[¶ 10] Under the "COVERED AUTOS" section of the policy the insured could select

from several numbered "Symbol" options to provide coverage, including:

"SYMBOL          DESCRIPTION

1 = ANY 'AUTO'.

    *     *     *     *     *     *

7 = SPECIFICALLY DESCRIBED 'AUTOS'. Only those 'autos' described in ITEM THREE of the Declarations for which a premium charge is shown (and for Liability Coverage any 'trailers' you don't own while attached to any power unit described in ITEM THREE).

8 = HIRED 'AUTOS' ONLY. Only those 'autos' you lease, hire, rent or *borrow*. This does not include any 'auto' you lease, hire, rent, or borrow from any of your employees or partners or members of their households.

9 = NONOWNED 'AUTOS' ONLY. Only those 'autos' you do not own, lease, hire, rent or borrow that are used in connection with your business. This includes 'autos' owned by your employees or partners or members of their households but only while used in your business or your personal affairs."

(Emphasis added). Kurry selected Symbol options 7, 8, and 9. He did not select coverage for "ANY 'AUTO'" which was the coverage available under Symbol 1.

[¶ 11] The Hannemans submitted a claim, seeking the limits of the Continental Western policy. They asserted Dawn Hanneman's death was covered under Symbol 8 because Kurry "borrowed" Dawn Hanneman's vehicle at the time of her death. Continental denied coverage for the death of Dawn Hanneman. The Hannemans brought this declaratory judgment action on May 21, 1996, naming Continental and Kurry as defendants.

[¶ 12] On July 8, 1996, the Hannemans signed a document purportedly releasing Kurry of personal liability in connection with the death of Dawn Hanneman. The agreement provided in part,

"[a]ll other claims, except as to Continental Western Insurance Company's insurance coverage, are hereby released by the Hannemans, including, but not limited to any claim for personal liability by Lee Kurry and including any claim for damages in excess of insurance coverage. The claim against Continental Western Insurance Company *is the only claim* being reserved by Hannemans. If it is determined that there is no coverage by Continental Western Insurance Company for Lee Kurry, then all claims by Hannemans against Lee Kurry are hereby extinguished."

(Emphasis retained). After concerns over the validity of the July 8, 1996, agreement, the Hannemans and Kurry signed a *Miller–Shugart* agreement on March 11, 1997. *See Sellie v. North Dakota Ins. Guar. Ass'n,* 494 N.W.2d 151 (N.D.1992) (recognizing the validity of a release of the type used in *Miller v. Shugart,* 316 N.W.2d 729 (Minn.1982)). The district court concluded the *Miller–Shugart* agreement accomplished little because the July agreement had already released Kurry from any further personal liability arising from either the wrongful death action or declaratory judgment action.

[¶ 13] After the July 8, 1996, agreement was executed, Ohio Casualty paid its policy limits of $50,000.00. With its policy limits expended, Ohio Casualty claimed its duty to defend Kurry was terminated and ended its defense of Kurry.

[¶ 14] As a result, Kurry asked his insurer, Continental Western, to assume his defense in the declaratory judgment action. Continental refused because Kurry was not exposed to personal liability in the declaratory judgment action. Continental also based its refusal to provide coverage on a portion of their policy stating, "we have no duty to defend 'suits' for 'bodily injury' or 'property damage' or a 'covered pollution cost or expense' not covered by this Coverage Form." Kurry filed a cross claim against Continental as a result of its refusal to pay his legal bills.

[¶ 15] After a procedural blizzard, replete with retaliating motions upon motions, the matter was heard before the district court. In the Hannemans' action, the court held in favor of Continental, because Dawn Hanneman remained in possession and control of the vehicle. Thus, the court concluded, Kurry did not "borrow" the vehicle; he was a

designated driver. The court also held in favor of Continental on Kurry's cross claim, concluding Kurry needed no defense after the July 8, 1996, agreement, because he could not be held personally liable.

## II

[¶ 16] On the Hannemans' appeal, they argue the district court erred in interpreting the policy. First, the Hannemans contend the district court erroneously interpreted the policy to require a business use in order to have coverage under the Continental Western policy. Second, the Hannemans argue the court erred in its conclusion that Kurry did not "borrow" Dawn Hanneman's vehicle.

### A. *Standard of Review*

[¶ 17] Continental submits the standard of review is "clearly erroneous" under Rule 52(a) of the North Dakota Rules of Civil Procedure because the district court made a finding of fact the Hanneman vehicle was not borrowed. The parties' Stipulation of Facts permitted the district court to make any findings of fact necessary to resolve the coverage issue, and the district court found Lee Kurry was driving Dawn Hanneman's vehicle at her behest and under her direction. The district court concluded the term "borrow" is synonymous with lease, hire, and rent expressing "the idea of receiving something from another for one's own use." Applying this interpretation to the aforementioned finding, the district court ultimately concluded the Continental policy did not provide coverage because Kurry was a "designated driver" and as such, "possession and control of the vehicle" remained with Dawn Hanneman.

[¶ 18] While the "designated driver" inference may be a finding of fact,[1] the interpretation of "borrow" and determination of coverage were conclusions of law.

[¶ 19] Review of a declaratory judgment decree is carried out under the same standards as any other case. N.D.C.C. § 32-23-07; *American Hardware Mut. Ins.*

Co. v. Dairyland Ins. Co., 304 N.W.2d 687, 689 (N.D.1981). Interpretation of an insurance contract is a question of law, fully reviewable on appeal. *Nodak Mut. Ins. Co. v. Heim*, 1997 ND 36, ¶ 12, 559 N.W.2d 846.

[¶ 20] Because this case involves the legal effect of a contract term, on appeal we fully review the issues by independently examining the insurance policy to determine if there is coverage. *Martin v. Allianz Life Ins. Co.*, 1998 ND 8, ¶ 9, 573 N.W.2d 823 (citing *Sellie*, 494 N.W.2d at 156).

### B. *Business–Use Limitation*

[¶ 21] The Hannemans claim the district court erred by adopting a "red herring" argument advanced by Continental. The district court concluded:

> "It is apparent that Continental intended to insure Kurry against liability for losses occurring to vehicles owned by Kurry, those which he listed on his policy, and any which he might use in his business, whether he paid rent for the vehicle or was able to borrow it without paying rent."

In the Continental policy, Symbol 9 expressly limited coverage to "[o]nly those 'autos' ... that are used in connection with your business." Unlike Symbol 9, Symbol 8 does not limit coverage to autos used in connection with a business. The Hannemans' declaratory action is based on Symbol 8.

[¶ 22] Continental does not dispute that Symbol 8's coverage was not conditioned on Kurry's business use. Continental argues, however, the policy should be read as a commercial policy, which implies Kurry was not covered under the policy when using the autos for personal use. Continental reasons that because the policy was issued to Lee Kurry, d/b/a/ Decorators Unlimited, it covered only the use of autos for his business.

[¶ 23] We construe insurance policies as a whole to give meaning to each word and phrase. *Martin*, 1998 ND 8, ¶ 15, 573 N.W.2d 823 (citing *Symington v. Walle Mut. Ins. Co.*, 1997 ND 93, ¶ 17, 563 N.W.2d 400). We also consider the type of policy at issue

---

1. The Hannemans do not aggressively dispute the district court's characterization of Kurry as a "designated driver." Instead, the Hannemans argue a "designated driver," like Kurry, should fit within the definition of "borrow."

in order to determine whether or not coverage is provided. *Cf. Martin*, 1998 ND 8, ¶ 15, 573 N.W.2d 823 (considering insurance contract titles as descriptive of the coverage provided in a death and dismemberment policy). We will not, however, add words to an insurance contract in order to alter the coverage. *Cf. Id.* at ¶ 11 (stating "[a]dding words to a contract in order to create an ambiguity violates the purpose of contract interpretation").

[¶ 24] Reading an insurance contract as a business or personal policy does not change the express language of the contract. Symbol 9 expressly limited coverage to only those autos Kurry did not "own, lease, hire, rent or borrow that [he] used in connection with [his] business." Thus, Symbol 9 provided coverage for the "nonowned" autos Kurry used while on the job. The business-use limitation under Symbol 9 shows that Continental "knew how to linguistically limit coverage . . . ." *See Kief Farmers Co-op. Elevator v. Farmland*, 534 N.W.2d 28, 35–36 (N.D. 1995). Generally, a limitation in one section of an insurance policy and the absence of similar limiting language in another section shows the insurer intended to limit in one section but not in another. *Id.* In this case, the absence of a business-use limitation in Symbol 8 indicates Continental intended to cover Kurry whenever he leased, hired, rented or borrowed an auto, regardless of whether Kurry used the vehicle for business or personal use. *Id.*

[¶ 25] Although the district court accepted this "red herring" argument, we affirm because the district court made other dispositive conclusions which compel judgment for Continental Western. "We will not set aside a correct result merely because the trial court assigned an incorrect reason if the result is the same under the correct law and reasoning." *City of Jamestown v. Leevers*, 552 N.W.2d 365, 369 (N.D.1996). *See also Hummel v. Mid Dakota Clinic, P.C.*, 526 N.W.2d 704 (N.D.1995); *Thompson v. Danner*, 507 N.W.2d 550 (N.D.1993); and *Ramsdell v. Ramsdell*, 454 N.W.2d 522 (N.D.1990).

### C. *Interpretation of "Borrow"*

[¶ 26] In its Amended Memorandum Decision, the district court recognized the essential question in this case is the meaning of the word "borrow." The district court concluded:

> "Lease, hire, rent, and borrow are synonymous when used as used in this policy. . . . The term borrow may be used to express the idea of receiving something from another for one's own use. [*Citing Black's Law Dictionary*].

> \*     \*     \*     \*     \*     \*

> Kurry did not lease, hire, rent, or borrow the car for his own use at all, much less as contemplated by Continental in its insuring agreement. He was, as argued by Continental, a 'designated driver.' [Dawn] Hanneman retained possession and control of the vehicle."

[¶ 27] Thus, the dispositive issue in this appeal is the interpretation of the contract term "borrow." When interpreting an insurance policy, we look first to the insurance contract itself. *Martin*, 1998 ND 8, ¶ 9, 573 N.W.2d 823; *Northwest G.F. Mut. Ins. Co. v. Norgard*, 518 N.W.2d 179, 183 (N.D.1994) (concluding the policy clearly and specifically reflects the intention of the parties with regard to the scope of coverage). If the contract is self-explanatory and subject to only one meaning, our inquiry is at an end. *Martin*, 1998 ND 8, ¶ 9, 573 N.W.2d 823. *See* N.D.C.C. § 9–07–02 (stating "[t]he language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity").

[¶ 28] On the other hand, the presence of an undefined term allows a court to look at other sources to provide the meaning. Although an ambiguity occurs when a term has two alternative meanings, *Martin*, 1998 ND 8, ¶ 10, 573 N.W.2d 823, merely because a contract term is undefined, disputable, or vague does not mean the issue is automatically resolved in favor of the insured. *Id.* (noting a party "jumps the gun" on contract interpretation by suggesting there is an ambiguity without first looking to the plain meaning). Rather, we principally look to the plain, ordinary meaning of the

undefined term to guide our interpretation. *Martin*, 1998 ND 8, ¶ 9, 573 N.W.2d 823 (citing *Aid Ins. Servs., Inc. v. Geiger*, 294 N.W.2d 411, 414–15 (N.D.1980)); N.D.C.C. § 9–07–09 (stating in part contract terms are to be understood in their ordinary sense). The plain meaning of a term is essential to our interpretation because we consider "whether a person not trained in the law or in the insurance business can clearly understand the language." *Kief Farmers*, 534 N.W.2d at 32. But we also look to other relevant rules of contract interpretation to determine the intent of the parties. *Continental Cas. Co. v. Kinsey*, 499 N.W.2d 574, 578 (N.D.1993). *See* N.D.C.C. Ch. 9–07.

■ [¶ 29] We look to principles of insurance law to see whether or not the undefined term has a technical meaning. *Martin*, 1998 ND 8, ¶ 12, 573 N.W.2d 823 (citing *Walle Mut. Ins. Co. v. Sweeney*, 419 N.W.2d 176, 181 (N.D.1988) (Vande Walle, J., concurring specially) for the proposition that complex insurance contracts are not viewed as simply as other contracts); N.D.C.C. § 9–07–09 (stating contract terms are to be understood in their ordinary sense "unless used by the parties in a technical sense, or unless a special meaning is given to them by usage"); N.D.C.C. § 9–07–10 (stating technical words are to be understood as they would be by persons in the business). And in rare cases, parol evidence may be used to decipher the intention of the parties. *Sellie*, 494 N.W.2d at 157 (noting when words "have an ordinary meaning, extrinsic evidence should not be used to show that the words were used in some other sense").

■ [¶ 30] If the relevant rules of statutory contract interpretation fail to remove an ambiguity in an insurance contract, only then is the ambiguity resolved in favor of the insured. *Martin*, 1998 ND 8, ¶ 10, 573 N.W.2d 823 (citing *Sweeney*, as requiring other statutory rules of interpretation to fail before ambiguities are held against the drafter under N.D.C.C. § 9–07–19); *Norgard*, 518 N.W.2d at 183 (conceding if ambiguity is not resolved by application of rules of contract interpretation ambiguous portion is construed against insurer). *But see Kinsey*, 499 N.W.2d at 579 (concluding "the Doctrine of Contract of Adhesion, unlike the strict construction rule of Section 9–07–19, N.D.C.C., is not a last resort guideline for contract interpretation").

■ [¶ 31] "Borrow" is not defined in the Continental policy. And the term is not a technical insurance term with a strict legal meaning. *State Farm Fire & Casualty Co. v. American Hardware Mutual Ins. Co.*, 224 Ga.App.789, 482 S.E.2d 714, 717 (1997) (noting "the word 'borrow' is not used as a technical word, word of art or with a unique or peculiar meaning such as may be employed in a particular trade or business"). Absent a contractual definition or a strict technical usage, we apply the plain, ordinary meaning of an undefined term to the insurance policy. *Martin*, 1998 ND 8, ¶¶ 9, 12, 573 N.W.2d 823. The dictionary is a good source to determine the plain, ordinary definition of an undefined term. *Martin*, 1998 ND 8, ¶ 12, 573 N.W.2d 823 (noting the ordinary meaning is the definition a non law-trained person would attach to the term). *See, e.g., Kim–Go v. J.P. Furlong Enters., Inc.*, 460 N.W.2d 694, 696 (N.D.1990) (relying on a dictionary to define "proportion"); *Hofco, Inc. v. National Union Fire Ins.*, 482 N.W.2d 397, 401 (Iowa 1992) (remarking a court will commonly refer to dictionaries in searching for the ordinary meaning of an undefined term).

[¶ 32] But, before we consider the dictionary definition of "borrow," we note there are a few cases interpreting the term "borrow" in an insurance policy. *See State Farm v. AHM*, 224 Ga.App. 789, 482 S.E.2d 714 (defining "borrow" as "to receive temporarily from another"); *American Family Mut. v. Allied Mut. Ins.*, 562 N.W.2d 159, 165 (Iowa 1997) (stating "borrow" means "to take or receive (something) with the understanding that one will return it or an equivalent"); *Davis v. Continental Ins. Co.*, 102 Ohio App.3d 82, 656 N.E.2d 1005, 1008 (1995) (stating "some element of substantial control is generally understood to be included within the prevailing meaning of the act of borrowing"); *Gore v. State Farm Mut. Ins. Co.*, 649 So.2d 162, 165 (La.App. 2 Cir.1995) (defining "borrow" as requiring "the borrower acquire substantial possession, dominion, control, or

the right to direct the use of the vehicle, and not merely that the use ... was for the benefit of a purported borrower"). Although none of the cases involve similar factual situations to the instant case, the analysis and interpretation is still instructive:

"The majority of other courts that have interpreted similar borrowed automobile provisions have also concluded that the term *borrow* connotes much more than merely receiving some benefit from another's use of a third person's vehicle. They have determined that borrowing a car requires possession reflecting dominion and control over the vehicle."

*Schroeder v. Board of Supervisors of Louisiana State Univ.*, 591 So.2d 342, 347 (La.1991) (citations omitted; emphasis retained).

[¶ 33] Requiring substantial possession and control over the vehicle is consistent with the plain, ordinary definition of "borrow." *The American Heritage College Dictionary* defines "borrow" as a verb meaning "[t]o obtain or receive (something) on loan with the promise or understanding of returning it or its equivalent .... [t]o adopt or use as one's own." *The American Heritage College Dictionary* 162 (3d ed.1997). The district court was correct in concluding "[t]he term borrow may be used to express the idea of receiving something from another for *one's own use.*" (Emphasis added).

[¶ 34] Kurry's status as a "designated driver" does not fit within the ordinary meaning of the contract term, "borrow." In this case, Dawn Hanneman asked Kurry to drive her car from Granville. She directed him on how to get to the Buffalo Lodge Lake party. Dawn Hanneman was the passenger, and Kurry was her driver. Even with Kurry behind the wheel, however, Dawn Hanneman remained in possession and control of the vehicle. The district court correctly concluded Kurry did not "borrow" Dawn Hanneman's car for his own use.

[¶ 35] The Hannemans argue Kurry received the benefit of getting a ride to the Buffalo Lodge Lake party and exercised control by speeding and installing his own "fuzz buster." Borrowing requires more than an incidental benefit to the purported borrower, more than the existence of imprudent decisions, and more than unsafe driving.

"[T]he prevailing meaning of the term *borrow* in the context of automobile lending requires that the borrower acquire substantial possession, dominion, control, or the right to direct the use of the vehicle, and not merely that the use of the vehicle by another person redound by chance to the benefit of a purported borrower."

*Schroeder*, 591 So.2d at 347 (emphasis retained). Dawn Hanneman directed the control of the vehicle. She determined Kurry would be the driver. Dawn Hanneman never surrendered possession of the vehicle to Kurry; she was a passenger in the car throughout the trip. Dawn Hanneman remained in possession and control of the vehicle.

[¶ 36] Finally, we note Kurry did not select coverage under Symbol 1 for "any 'auto.'" Had Kurry selected Symbol 1 coverage, he would have been covered in the present case. Unlike Symbol 1, Symbol 8's coverage is limited to situations such as when an insured borrows a vehicle for his business or personal use. To interpret the term "borrow" on the basis of any sort of benefit to Kurry, would eliminate any difference between Symbols 1 and 8. Similarly, to have the control needed to drive a car determine whether someone "borrowed" the car would provide coverage in every situation where Kurry got behind the wheel of another's car. We will not interpret the term "borrow" so broadly the contract language becomes meaningless.

[¶ 37] We agree with the district court's interpretation of the Continental Western policy. The term "borrow" expresses the idea of receiving something from another for one's own use. The district court correctly concluded Kurry did not "borrow" Hanneman's car for his own use at all; he was a "designated driver."

III

[¶ 38] On appeal of his cross claim, Kurry submits the district court erred in concluding he did not need a defense after the July 8, 1996, agreement. The district court concluded the July 8, 1996, agreement was supported by consideration, i.e., the $50,000.00 from Ohio Casualty, and the agreement re-

leased Kurry from personal liability. The court further concluded the later-executed, *Miller–Shugart* agreement was without consideration and served no real purpose because Kurry was already released from personal liability by the July 8 agreement.

### A. *Insurer's Duty to Defend*

[¶ 39] The interpretation of settlement contracts as well as the insurance contract are questions of law, fully reviewable on appeal. *Moen v. Meidinger,* 547 N.W.2d 544, 546 (N.D.1996); *Heim,* 1997 ND 36, ¶ 12, 559 N.W.2d 846. The insurer's duty to defend and duty to indemnify are two different issues. *Smith v. American Family Mut. Ins. Co.,* 294 N.W.2d 751, 759 (N.D. 1980). "Ordinarily, an insurer has a duty to defend an underlying action against its insured if the allegations in the complaint give rise to potential liability or a possibility of coverage under the insurance policy." *Heim,* 1997 ND 36, ¶ 11, 559 N.W.2d 846.

[¶ 40] The question is whether the July 8, 1996, agreement removed any potential liability for Kurry. Continental correctly notes some distinctions between a *Miller–Shugart* agreement and the July agreement. The July agreement contains no determination as to damages or confession of judgment by Kurry. It is not a *Miller–Shugart* agreement.

[¶ 41] The concept known as a *Miller–Shugart* agreement crossed the Red River from Minnesota and became part of our case law. *See Sellie,* 494 N.W.2d 151 (recognizing the validity of a release of the type used in *Miller v. Shugart* 316 N.W.2d 729 (Minn. 1982)). Minnesota has defined the agreement as follows:

> "A *Miller–Shugart* agreement is an agreement in which one party admits liability and consents to having a judgment entered against him on the express condition that the other party will satisfy the judgment only out of proceeds from the first party's insurer instead of proceeding against the first party personally."

*Chalmers v. Kanawyer,* 544 N.W.2d 795, 796 fn. 1 (Minn.App.1996). *See Medd v. Fonder,* 543 N.W.2d 483, 485 (N.D.1996) (explaining a

*Miller–Shugart* settlement as adopted in North Dakota).

[¶ 42] "[A] *Miller–Shugart* agreement reduced to judgment is enforceable against an insurer if: '(1) the insurer receives notice of the agreement; (2) the agreement is not the result of fraud or collusion; and (3) the agreement is reasonable.' " *D.E.M. v. Allickson,* 555 N.W.2d 596, 602 (N.D.1996). While notice to the insurer is ordinarily required, "[n]otice is not required if the insurer has refused to defend and has abandoned its insured." *Id.* *But see Buysse v. Baumann–Furrie & Co.,* 448 N.W.2d 865 (Minn.1989) (concluding stipulated judgment and policy coverage may be voided if the insured deprives insurer of contractual right to defend and settle by admitting liability up to policy limit in a case where insurer admitted coverage may exist and was defending insured in action to determine coverage).

[¶ 43] While the July 8, 1996, agreement is not a *Miller–Shugart* agreement, it released Kurry from all personal liability. The July agreement unequivocally provided:

> "All other claims, except as to Continental Western Insurance Company's insurance coverage, are hereby released by the Hannemans, including, but not limited to any claim for personal liability by Lee Kurry and including any claim for damages in excess of insurance coverage. The claim against Continental Western Insurance Company *is the only claim* being reserved by Hannemans. If it is determined that there is no coverage by Continental Western Insurance Company for Lee Kurry, then all claims by Hannemans against Lee Kurry are hereby extinguished."

(Emphasis retained).

[¶ 44] Remarkably, Kurry maintains he still faced potential personal liability under the terms of the July agreement. In his brief, Kurry states:

> "While Kurry may have been released from making any personal contribution to a judgment under these terms, he still faced *potential personal liability* because the Hannemans would have to go through him—by pursuing an action against him in

a court of law—before they could gain access to any of his insurance proceeds."

Among the liabilities Kurry envisions are the responsibility to appear at court proceedings and depositions and the need to read and respond to legal documents.

[¶ 45] Putting aside Kurry's commodious view of "personal liability," we believe the July 8, 1996, agreement released him from the liability of having to satisfy a judgment for damages. That is the liability covered by the Continental policy. Continental's duty to defend extended to only those " 'suits' for 'bodily injury' or 'property damage' ... covered by [the] Coverage Form." The policy defines "suit" as "a civil proceeding in which *damages* because of 'bodily injury', 'property damage', or 'covered pollution cost or expense', to which this insurance applies are alleged." (Emphasis added). It is clear that regardless of the outcome of this declaratory judgment action, Kurry was relieved of having to pay any money in damages by the July agreement. "A liability insurer's duty to defend its insured exists only if it would be held bound to indemnify the insured in case the injured person prevailed upon the allegations of the complaint." *Employers Reinsurance Corp. v. Landmark,* 547 N.W.2d 527, 533 (N.D.1996). Continental has no duty to provide a defense in an action that would yield no possibility of liability to its insured.

### B. *Insurer's Payment of Expenses*

[¶ 46] Kurry cites *State Farm Fire and Cas. Co. v. Sigman,* 508 N.W.2d 323 (N.D.1993), as requiring an insurer to pay attorneys fees and expenses in this declaratory judgment action. In *Sigman,* a majority of this Court concluded the policy language allowed for payment of attorneys fees in a declaratory judgment action brought by State Farm to determine coverage. *Id.* There is a difference, however, between an insurer's duty to defend and this Court's

holding in *Sigman.* The *Sigman* majority concluded "the language that State Farm will pay its insured's 'reasonable expenses' incurred at the company's 'request' is broad in scope and is without express conditions." *Id.* at 325. *See also Johnson v. Center Mut. Ins. Co.,* 529 N.W.2d 568 (N.D.1995). While the Continental policy contains similar language,[2] this case is governed by the duty to defend clause, not the payment-of-expenses clause.

[¶ 47] In part II of this opinion we concluded Kurry is not an "insured" under the Continental policy. This Court has declined to apply *Sigman* to instances where the court determines there is no coverage absent contractual or statutory authority. *State Farm Mut. Auto. Ins. Co. v. Estate of Gabel,* 539 N.W.2d 290, 294 (N.D.1995) (noting *Sigman* expressed no opinion about an insurer's obligation to pay its insured's attorneys fees and expenses when the court determines there is no coverage). In this case, the payment-of-expenses language in the Continental policy is expressly reserved to " 'insured[s].' " We will not apply *Sigman* to cases where the court determines there is no coverage. *Estate of Gabel,* 539 N.W.2d at 294. *See Sigman,* 508 N.W.2d at 328 (VandeWalle, C.J., dissenting) (stating the clear legislative intent of section 32–23–06, N.D.C.C., "was to prevent the insurer from being required to expend its resources to defend when it believed no duty to do so was present...."); 1983 N.D. Laws Ch. 377, § 1 (amending N.D.C.C. § 32–23–06).

[¶ 48] In addition, unlike *Sigman* and *Johnson,* this action was not brought by the insurer or insured, but by a third party. *Compare Sigman,* 508 N.W.2d at 323 (noting insurer brought declaratory action); *Johnson,* 529 N.W.2d at 569 (recognizing insureds brought declaratory action). Kurry was brought into this declaratory action by the Hannemans, not his insurer. The declaratory action was not brought at the insurer's

---

**2.** "2. COVERAGE EXTENSIONS
    a. Supplementary Payments. In addition to the Limit of Insurance, we will pay for the "insured":

\*   \*   \*   \*   \*   \*

(4) All reasonable expenses incurred by the "insured" at our request...."

"request." There is no contractual relationship between the Hannemans and Continental, and no contractual language requires the payment of expenses because Kurry is not an "insured" under the Continental policy.

[¶ 49] Finally, we observe that when the Hannemans' declaratory action was filed on May 21, 1996, Kurry's attorneys fees were still being paid by Ohio Casualty. Less than two months later, on July 8, 1996, the Hannemans settled with Kurry and Ohio Casualty with the July release agreement. Instead of moving to dismiss Kurry, Ohio Casualty paid its settlement and ended its defense of him. Kurry did not bother to extricate himself from the lawsuit.

[¶ 50] We conclude Continental was not required to pay Kurry's attorneys fees and expenses.

### IV

[¶ 51] We hold the term "borrow" expresses the idea of receiving something from another for one's own use. Lee G. Kurry was not covered by the Continental Western Insurance policy because Kurry did not "borrow" Dawn Hanneman's car. We further hold Continental had no duty to defend Kurry because he was released from personal liability. Continental is not required to pay Kurry's attorneys fees and expenses.

[¶ 52] We affirm.

[¶ 53] SANDSTROM and NEUMANN, JJ., concur.

MESCHKE, Justice, concurring and dissenting.

[¶ 54] I agree with parts I, II A, II B, and III A of the majority opinion. I respectfully dissent from parts II C and III B.

[¶ 55] "Borrow," in its most relevant sense, plainly means "to use as one's own." *The*

American Heritage Dictionary 82 (2d college ed.1983). *See also The Random House Dictionary* 173 (unabridged ed. 1966)("To use, appropriate, or introduce from another source"); *Webster's Third New International Dictionary* 256 (1971)("obtain the temporary use of"); *The New Merriam–Webster Dictionary* 99 (1989)("to take into possession or use from another source"); and *Black's Law Dictionary* 185 (6th ed. 1990)("The term may be used to express the idea of receiving something from another for one's own use."). There is no ambiguity in the policy's coverage of a borrowed auto.

[¶ 56] "Borrow" means to "use." By driving Dawn's auto, plainly Kurry "used" it. Continental contracted to insure not only Kurry's "ownership," but also his "use" of a non-owned auto.[3]

[¶ 57] Kurry used and drove Dawn's auto temporarily. Coverage 8 insured personal use of a borrowed auto. As part II B of the majority recognizes, Coverage 8 is not confined to "business use," but covers any personal use. So, why Kurry drove and used Dawn's auto, where he went with it, or who accompanied him is not material to the contracted coverage, and should not be used to create an ambiguity where none exists. Driving uses an auto.

[¶ 58] In concluding that "Lease, hire, rent and borrow are synonymous when used as used in this policy ...," the trial court clearly erred. We construe "insurance policies as a whole to give meaning to each word and phrase." *Martin v. Allianz Life Ins. Co.*, 1998 ND 8, ¶ 15, 573 N.W.2d 823 (citing *Symington v. Walle Mut. Ins. Co.*, 1997 ND 93, ¶ 17, 563 N.W.2d 400). While Kurry did not lease an auto from a dealer, hire one from a neighbor, or rent one from a auto rental business to take his friend to a party, he did "borrow," drive, and "use" Dawn's auto to do so.[4] It does not matter whether

---

3. *See* 8 Couch on Insurance 3D § 111:35 (*"Common or Ordinary Meaning"*): " 'Use' is to be given its ordinary meaning. It denotes the employment of the automobile for some purpose of the user." *See also* 6B Appleman, *Insurance Law and Practice* § 4316: "The term 'use' is the general catch-all of the insuring clause, designed and construed to include all proper uses of the vehicle not falling within one of the previous terms of definition [ownership; maintenance]."

4. The "Renewal Declaration" with the policy itemized a separate premium for the "Schedule of Hired or Borrowed Covered Auto Coverage and Premiums," and listed the "Estimated Cost of Hire" as "if any." In "Section II–Liability Coverage" of the policy the definition of "WHO

he was a "designated driver" for his companion, why he did so, or where he went. Kurry personally "used" Dawn's auto by driving it, and the policy covered his personal use of a borrowed auto without any language limiting the purpose of his personal borrowing and using.[5]

[¶ 59] Kurry's insurance company contracted to insure him against liability not only "resulting from the ownership [or] maintenance ... of a covered 'auto,'" but also "resulting from ... *use* of a covered 'auto.'" (my emphasis). The policy insured Kurry's generalized "use" of a "borrowed" auto, not his personal purpose. Under Continental's Coverage 8, anyone's "auto" that Kurry "borrowed," drove, and "used" for his own purposes was covered, whether his use benefitted someone else or not.

[¶ 60] By concluding that "Kurry did not 'borrow' Hanneman's car for his own use at all" because "he was a 'designated driver,'" the majority reads ambiguities and meanings into the policy that are not there. Kurry's

insurance company plainly contracted to cover him personally whenever Kurry drove and used any auto borrowed for personal reasons.[6]

[¶ 61] Since I would conclude Kurry was unambiguously insured while driving and using a borrowed auto, I respectfully dissent from part II C. Since Kurry was contractually insured by Continental, in my opinion, the analysis and the conclusion in part III B are also wrong, and I respectfully dissent from part III B, too. I would reverse and remand with directions to enter the appropriate judgment for Hannemans.

[¶ 62] MARING, J., concurs.

---

IS AN INSURED" excepts "(1) The owner or anyone else from whom you hire or borrow a covered 'auto.'" Since she was not an additional *insured* under *Kurry's* Continental policy, she is a proper claimant.

**5.**  1 Rowland H. Long, *The Law of Liability Insurance* § 4.12(part):

The hired automobile provisions are also meant to deal with borrowers. All such provisions are similar to those dealing with non-owned automobile coverage which was discussed earlier. When borrowed automobile provisions are included in the policy, the rule is different from the rules applicable to hired automobiles and which have just been stated in this section. A borrower is one *using* the vehicle who is in possession of that vehicle. (my emphasis).

**6.**  North Dakota law requires "proof of ability to respond in damages for liability, on account of accidents ... arising out of the ownership, main-

tenance, or use of a motor vehicle" on its highways. N.D.C.C. § 39–16.1–02. *See* N.D.C.C. §§ 39–16.1–08 and 39–16.1–09. A satisfactory "motor vehicle liability policy" includes either an owner's policy or an operator's policy of liability insurance. N.D.C.C. § 39–16.1–11(1). An operator's policy of liability insurance "must insure the person named as insured therein against loss from the liability imposed upon the person by law for damages arising out of the use by the person of any motor vehicle, either unlimited, or limited by excluding certain classes or types of motor vehicles, within the same territorial limits and subject to the same limits of liability as are set forth above with respect to an owner's policy of liability insurance." N.D.C.C. § 39–16.1–11(3). Kurry's personal "borrowed" auto coverage only excluded any auto borrowed from his employees, partners, or members of their households. Dawn was not an employee or partner of Kurry's, nor a member of an employee's or partner's household. There is *no other exclusion* expressed in Kurry's "borrowed auto" Coverage 8.