NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0507n.06

No. 20-3014

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| KATHLEEN O'KEEFFE, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellant, | ) | Aug 27, 2020 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| CONTINENTAL CASUALTY COMPANY, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| Defendant-Appellee. | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| | ) | |
| | ) | |

BEFORE:     CLAY, WHITE, and READLER, Circuit Judges.

**CHAD A. READLER, Circuit Judge.** A decade ago, policyholders sued Continental Casualty Company (CNA) over its interpretation of certain long-term care policies. A settlement resulted in CNA agreeing to, among other things, offer a new, alternative benefit to policyholders. Today's case challenges the parameters of that alternative benefit. Agreeing with the district court that CNA's interpretation is correct, we **AFFIRM** the judgment below.

## BACKGROUND

*The policy.* Prior to her death, Vivian O'Connell was insured under a long-term care policy issued by CNA. The policy defrayed the cost of a policyholder's medical needs later in life by paying a daily "Long-Term Care Facility Benefit" (LTCF Benefit) for a "benefit period" chosen by the policyholder (in this case, six years). In addition to the benefit period limitation, the LTCF Benefit was also subject to a daily reimbursement limit (in this case, $60 per day). Further, the LTCF Benefit could be utilized only at facilities meeting strict qualifications.

As an alternative to the LTCF Benefit, O'Connell's policy also offered the possibility of an "Alternative Plan of Care Benefit" (APC Benefit). Policyholders who "otherwise require[d] an eligible confinement" could utilize this benefit upon consultation with and agreement from both CNA and medical professionals. Should agreement over a suitable APC Benefit come to pass, payments to the policyholder would be set by negotiation and subject to a "maximum dollar benefit" that applied to "the total of all benefits" paid by the LTCF or APC Benefits. Examples in the policy of potential APC Benefits included a wheelchair ramp, kitchen/bathroom modifications, and Alzheimer's care.

*The* Pavlov *litigation*. In 2009, CNA policyholders initiated a class action challenging CNA's standard for determining which long-term facilities qualify for LTCF Benefit coverage. *Pavlov v. Cont'l Cas. Co.*, No. 5:07CV02580, 2009 WL 10689011 (N.D. Ohio Oct. 7, 2009). The policy required that a long-term care facility have "24 hours a day" nursing services to be eligible for coverage. *Id*. at *1. The parties disputed whether that provision meant that a nurse had to be "on-site" at all times.

The case settled. *Id*. at *16. As part of the settlement, CNA agreed that a facility would so qualify if it had a nurse on-site for five hours a day, seven days a week. *Id*. at *2. For policyholders in facilities that did not meet even that lower bar, the settlement agreement offered a second option, the "Alternative Plan of Care ('APC') benefit or accommodation," or settlement APC benefit. For policyholders utilizing non-qualifying facilities, the settlement APC benefit would pay the policyholder the greater of 25% of the daily LTCF Benefit limit or the actual daily cost of the facility, capped by the lesser of the daily LTCF Benefit limit or the actual daily cost of the facility.

The *Pavlov* Agreement contained two other provisions relevant to this litigation. One was a clause asserting that a breach of its provisions would be a breach of contract, not a violation of a court order. A second clause stated that the "claims handling change" relating to the nurse provision—itself exclusively part of the LTCF Benefit, and not the policy's APC Benefit—"shall not affect any other term of the policy."

*The current case.* O'Connell received two years of LTCF Benefits before moving to a non-qualifying facility. At the new facility, CNA provided her settlement APC benefits pursuant to the *Pavlov* Agreement. CNA terminated the settlement APC payments after four years, asserting that O'Connell had exhausted her collective six-year benefit period. O'Connell, however, believed that the policy's benefit period limitation applied only to LTCF Benefits, not her settlement APC benefit. Claiming a violation of the *Pavlov* Agreement, O'Connell, through her daughter Kathleen O'Keeffe, initiated a class action against CNA.

O'Connell brought three claims. The first was that CNA breached its *Pavlov* settlement obligations. O'Connell argued that her settlement APC benefits were limited not by the six-year benefit period, but instead by the "maximum dollar benefit" term in her policy. As that cap was $131,400 ($60 per day, 365 days per year, 6 years), O'Connell asserted that CNA breached the *Pavlov* Agreement by terminating O'Connell's benefits before she had received $131,400 in benefits. O'Connell's second claim was that CNA's conduct amounted to bad faith under Illinois common law. Finally, O'Connell claimed entitlement to attorney's fees under Illinois law.

The district court granted CNA's motion to dismiss. Interpreting the *Pavlov* Agreement and O'Connell's policy, the district court held that the benefit period limitation applied to both LTCF Benefits and the *Pavlov* Agreement APC benefits. Likewise, because the policy's maximum dollar benefit serves as a ceiling (but not a floor) on the sum of APC and LTCF Benefits,

3

the district court rejected O'Connell's argument that she was entitled to that full amount. And having held that CNA did not breach the *Pavlov* Agreement, the district court dismissed O'Connell's remaining claims as well, which relied on the occurrence of a breach of contract. O'Connell timely appealed.

## ANALYSIS

I. At the crux of this appeal is the district court's reading of the *Pavlov* Agreement together with O'Connell's original policy. We review the district court's decision to grant a motion to dismiss for failure to state a claim de novo. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 469 (6th Cir. 2014). In undertaking that review, we accept O'Connell's "allegations as true and construe the complaint in [her] favor, but the complaint's factual allegations must be enough to raise a right to relief above the speculative level." *Id.* (cleaned up).

As a preliminary matter, this case has the potential to raise thorny conflict-of-law questions: the *Pavlov* Agreement has a choice-of-law clause that selects Illinois law, O'Connell moved to a North Dakota facility during the relevant period, and her complaint was filed in Ohio. As this case is before us on diversity jurisdiction, we would ordinarily apply Ohio's conflict-of-laws doctrine to determine whether Illinois or North Dakota contract law governs the dispute. *State Farm Mut. Auto. Ins. Co. v. Norcold, Inc.*, 849 F.3d 328, 331 (6th Cir. 2017) (applying the conflict-of-law rules of the forum state to determine which substantive state law applies). But here, the parties agree that whether the governing law is from North Dakota or Illinois, our directive is to give contract terms their "plain, ordinary, and popular meaning." *Founders Ins. Co. v. Munoz*, 930 N.E.2d 999, 1005 (Ill. 2010); *accord In re Estate of Littlejohn*, 698 N.W.2d 923, 925–26 (N.D. 2005). Perhaps, as CNA contends, a court applying North Dakota law might also consider provision titles in insurance policies as descriptive of coverage. *Hanneman v. Cont'l W.*

*Ins. Co.*, 575 N.W.2d 445, 449–50 (N.D. 1998). But even then, a title cannot be interpreted to "add words to an insurance contract in order to alter the coverage"; it is merely an additional clue in determining coverage. *Id*. at 450.

II. Against this legal backdrop, and with an eye towards text and structure, the best reading of the *Pavlov* Agreement is that the *Pavlov* APC benefit terminates at the end of a policyholder's benefit period.

1. At its core, the *Pavlov* APC is an alternative to the standard LTCF Benefit. At issue in *Pavlov* was the nursing-care requirement a long-term care facility must satisfy to make it eligible for the LTCF Benefit. In settling the dispute, CNA agreed to loosen those requirements, thereby expanding the number of facilities for which LTCF Benefits apply. And for those facilities that remain non-qualifying, a policyholder could utilize a reduced version of the LTCF Benefit—the settlement APC benefit at issue here.

The settlement APC benefit is thus best described as a "lite" version of the LTCF Benefit. To receive the *Pavlov* APC benefit, the policyholder must meet all the requirements for the LTCF Benefit, save for the in-patient nursing services requirement. In exchange for the added flexibility in the facilities one can select from, the policyholder receives benefits lower than those guaranteed through the LTCF Benefit. Under the settlement APC benefit, the policyholder at most receives either the actual cost of the facility or a quarter of the LTCF Benefit, with that amount capped by the lesser of either the actual facility cost or the LTCF Benefit limit. And as a reduced version of the LTCF Benefit, the *Pavlov* APC benefit logically cannot outlast the LTCF Benefit. That is, the *Pavlov* APC benefit, as a lesser form of the LTCF Benefit, shares the same benefit period limitation, and thus terminates at the same time.

Reading the *Pavlov* APC benefit as lasting as long as a policyholder's benefit period fairly honors the policy selection made by O'Connell. As a general matter, policyholders (including O'Connell) can purchase policies with a longer benefit period, a point O'Connell acknowledges. And as to the *Pavlov* Agreement specifically, it does not require that O'Connell accept either the LTCF Benefit or the settlement APC benefit offered. She remains free, as she was before the *Pavlov* settlement, to negotiate an alternative APC Benefit more to her liking. What O'Connell could not do is both accept the *Pavlov* APC benefit and, at the same time, rewrite the rules for that benefit without agreement from her insurer.

2. O'Connell sees things differently. To her mind, a policyholder who selects the *Pavlov* APC benefit must also receive the same gross benefits amount as one who selects the LTCF Benefit, just over a longer period. But that is an odd interpretation of the settlement. After all, if a policyholder must receive the same gross amount regardless whether she elects a qualifying or non-qualifying facility, what is the practical difference between choosing between the two? To accept O'Connell's reading of the *Pavlov* Agreement, one would need to believe that CNA agreed to extend coverage to policyholders it had previously determined were not in qualifying facilities, and that did not even meet the compromise on-site nursing requirements under the settlement agreement, in return for nothing more than the option to make full payments in the form of LTCF Benefits or full payments in the form of *Pavlov* APC benefits.

It may be, as O'Connell suggests, that the latter scenario would allow CNA to pay out APC benefits more slowly than it does LTCF Benefits, meaning the company would benefit from the time value of money and a policyholder's decreasing remaining life expectancy. But O'Connell points to nothing in the *Pavlov* Agreement's text that suggests either party considered this rationale. What is more, her rationale rests on a host of assumptions about what CNA believed

about the market, investment opportunities, generational aging rates, and policyholder incentives. The simpler reading of the *Pavlov* Agreement is thus the better one: in return for being able to utilize facilities that still do not meet even a compromised form of the nursing requirement, policyholders must take a haircut to their benefit.

O'Connell's interpretation also lacks textual footing. Under her interpretation, CNA must pay a policyholder who elects the *Pavlov* APC the agreed upon daily amount but waive the LTCF's benefit period limitation until the policyholder is paid the full "maximum dollar benefit." But the *Pavlov* Agreement's APC benefit does not reference a "maximum dollar benefit." True, the *Pavlov* Agreement's defines the term "APC Benefit" as the "benefit so-described in the Policies." And the policy's APC Benefit provision conditions any APC Benefit to a maximum dollar benefit. But reading the *Pavlov* Agreement to both implicitly incorporate the policy's reference to a maximum amount and then to guarantee that maximum amount is not only inconsistent with the relevant text, but it also would transform the policy ceiling into a floor.

Other textual clues in the *Pavlov* Agreement further undermine the notion that the *Pavlov* APC benefit is equivalent to the APC Benefit in O'Connell's policy. For one, the *Pavlov* Agreement uses the term "APC Benefit" to refer to the policy's APC Benefit, but uses the term "APC benefit or accommodation" to refer to the *Pavlov* APC. For another, those distinct APCs have distinct features. The *Pavlov* "APC benefit or accommodation" is a pre-negotiated, settled benefit. In creating that benefit, the *Pavlov* Agreement at the same time expressly contemplates that CNA and policyholders like O'Connell might also negotiate a different APC, with different requirements, pursuant to the policy. The *Pavlov* Agreement further contemplates providing the *Pavlov* "APC benefit or accommodation" even to policies that lack a built-in "APC Benefit." In

such a case, O'Connell's arguments—based on her policy's APC Benefit terms—could not affect the duration of the *Pavlov* Agreement's "APC benefit or accommodation."

Even if one viewed the *Pavlov* APC as materially equivalent to the APC Benefit in the policy, that does not entitle O'Connell to benefits unbound by a benefit period. Remember that the APC Benefit's touchstones are flexibility and negotiability, not guaranteed benefits. It is a flexible alternative to the policy's conventional LTCF Benefit, allowing CNA potentially to pay less while providing a more-preferred living arrangement for an insured who would otherwise require institutional long-term care. Other than capping the total APC and LTCF Benefits at the maximum dollar benefit, the APC provision is otherwise largely bereft of substance, its terms to be negotiated; the APC Benefit thus comes into effect only if its terms are mutually agreed upon by the policyholder, her physician, and CNA. That gives needed flexibility to both CNA and the policyholder. After all, with long-term care insurance policies purchased with an eye towards an uncertain future, there may be instances where an alternative arrangement benefits both the policyholder and CNA. Yet that flexibility similarly means the APC Benefit does not guarantee O'Connell an unlimited benefit period. The APC Benefit entitles O'Connell to an opportunity to negotiate an alternative benefit period, but not a unilateral right to select one.

That reality similarly answers O'Connell's argument regarding her policy's reference to the "period of care" in limiting the funds for an APC Benefit to the maximum dollar benefit (not the benefit period). True, the period of care, as defined in the policy, is broader than the benefit period. Yet here again, this merely reflects the APC's flexibility. During negotiations, the policyholder and CNA may (or may not) elect to tie the negotiated APC to the benefit period.

No more convincing is O'Connell's argument that because the APC provision lists a wheelchair ramp and a modified kitchen/bathroom as possible APC benefits, which require a lump

sum payment (and not a stream of daily benefits), the APC Benefit must not be tied to a benefit period. These are merely "non-exhaustive" examples, per the terms of the policy. And another example in the policy—"care provided in Alzheimer's Centers or similar arrangements"—*does* require a stream of daily benefits. In some situations, to be sure, APC Benefits may not be tied to a benefit period. But the issue before the district court was whether *this particular APC*, offered as part of the *Pavlov* Agreement, was tied to a benefit period. As previously explained, it is.

Had the *Pavlov* Agreement more explicitly defined a benefit period associated with the *Pavlov* APC, that may well have fortified CNA's position. But we have enough here nonetheless to resolve the case in CNA's favor. To the extent one might characterize aspects of the *Pavlov* Agreement as ambiguous, today's case is a poor candidate for applying the rule that we resolve ambiguities in insurance agreements against the insurer. Courts sometimes do so where a policy was drafted solely by the insurer, and presented to the insured on a take-it-or-leave-it basis. *See Kief Farmers Coop. Elevator Co. v. Farmland Mut. Ins. Co.*, 534 N.W.2d 28, 32 (N.D. 1995); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1212 (Ill. 1992). That does not describe the *Pavlov* Agreement, which is not an insurance policy, but rather the product of both fierce litigation and negotiated compromise between sophisticated counsel.

III. That leaves O'Connell's common-law claim of bad faith and her Illinois-statutory claim for attorney's fees. Each of those claims requires that there be a breach of contract. *See Hart Constr. Co. v. Am. Fam. Mut. Ins. Co.*, 514 N.W.2d 384, 391–92 (N.D. 1994); *Martin v. Ill. Farmers Ins.*, 742 N.E.2d 848, 857–58 (Ill. Ct. App. 2000). Because, as just explained, there is no breach here, O'Connell's claims for bad faith and attorney's fees both fail.

**CONCLUSION**

For these reasons, we **AFFIRM** the judgment of the district court.

**HELENE N. WHITE, dissenting.** The majority opinion advances a lawyerly argument but pays only lip service to the policy language. Because its conclusion is contrary to the policy language, I respectfully dissent.

CNA contends that O'Connell's eligibility for benefits terminated under the policy because she exhausted her contractual "benefit period," which all agree is six years. "Benefit period" is a defined term in the policy: "The length of time You are eligible to receive Long-Term Care benefits in a Period of Care as shown on the Policy Schedule Page." (R. 1-2, PID 129.) Thus, the benefit period limits the length of time a policyholder may receive Long-Term Care benefits.

In O'Connell's case, that period was six years. Yet she received Long-Term Care benefits for only two. For the next four years, she received a different benefit, an Alternative Plan of Care (APC) benefit. As described in her policy, that benefit is meant to cover services that "may differ from those otherwise covered by [the] policy," and is "paid at the levels specified in the Alternative Plan of Care." (*Id.* at PID 131.) There is no reference in the APC provision to the "benefit period," and, importantly, there is no reference to APC benefits in the "benefit period" definition. (*Id.* at PID 129, 131.) Thus, the operative policy provision—benefit period—unambiguously draws its meaning solely by reference to eligibility for Long-Term Care benefits.

According to the majority, it does not matter that the policy makes no mention of a benefit period in connection with APC benefits because the particular APC benefit O'Connell received was offered as an "alternative" to the Long-Term Care benefit as part of the *Pavlov* settlement. (Maj. Op. at 5.) The majority concludes that because the APC benefit was negotiated as an alternative to the Long-Term Care benefit, it must also be subject to the same benefit period. But the *Pavlov* settlement agreement does not say that. To the contrary, the agreement states that "[t]he claims handling changes discussed in this section *shall not affect any other term of the policy*."

(R. 1-1, PID 45.) That means that the definition of "benefit period" in O'Connell's policy was unaltered by the settlement, and "benefit period" continues to mean the length of time she was eligible to receive Long-Term Care benefits in a Period of Care. Although the settlement agreement might have stated that any APC benefits under the agreement are to be treated as Long Term Care benefits for purposes of the policies, it did not.[1]

To be sure, the *Pavlov* settlement agreement's failure to address the length of time a policyholder may receive the *Pavlov* APC benefit leaves some uncertainty. Perhaps this was an oversight; perhaps the parties had an understanding that is not reflected in the record now before us; or perhaps the omission and the express preservation of the existing policy language relate to the differences in policy language across the class. In any event, at this stage of the proceeding, the uncertainty is not properly resolved by stretching the policy provisions to fill perceived gaps in the settlement agreement, especially when the settlement agreement expressly preserves the existing policy language.

I would REVERSE the dismissal of O'Keeffe's claims and remand for further proceedings.

---

[1]The case was dismissed on the pleadings and there was no discovery. We do not know whether there were understandings not reflected on the face of the settlement agreement. We note that apparently some of CNA's long-term-care policies include an APC benefit and some do not. The majority's position is more persuasive with respect to the latter policies, which do not contemplate any benefit other than the Long Term Care benefit. Here, however, the policy does contemplate an APC benefit and treats it as irrelevant to the computation of the "benefit period."