2012 ND 81

**Mark L. TIBERT, Melvin J. Tibert, Sue Votava Tibert, and William Tibert, Plaintiffs and Appellants**

v.

**NODAK MUTUAL INSURANCE COMPANY, a North Dakota Corporation, Defendant and Appellee.**

No. 20110143.

Supreme Court of North Dakota.

April 12, 2012.

*See also* 776 N.W.2d 549.

Scott D. Jensen, Grand Forks, N.D., for plaintiffs and appellants.

Scott K. Porsborg, Bismarck, N.D., for defendant and appellee.

SANDSTROM, Justice.

[¶ 1] Mark Tibert, Melvin Tibert, Sue Tibert, and William Tibert ("Tiberts") appeal from a district court summary judgment dismissing their declaratory judgment action against Nodak Mutual Insurance Company ("Nodak"). We affirm in part, reverse in part, and remand for further proceedings, concluding the district court did not err in concluding Nodak had no duty to indemnify the Tiberts for damages they were ordered to

pay in an underlying lawsuit but did err in concluding Nodak had no duty to defend the Tiberts in the lawsuit.

I

[¶ 2]   Mark, Melvin, and William Tibert are brothers, and Sue Tibert is Mark's wife. The Tiberts have been involved in a lengthy dispute, including extensive litigation, with Minto Grain, LLC, and its owners, William and Katherine Slominski (collectively "Minto Grain"). *See Minto Grain, LLC v. Tibert*, 2009 ND 213, 776 N.W.2d 549; *Tibert v. City of Minto*, 2006 ND 189, 720 N.W.2d 921; *Tibert v. Slominski*, 2005 ND 34, 692 N.W.2d 133; *Tibert v. Minto Grain, LLC*, 2004 ND 133, 682 N.W.2d 294; *Minto Grain, LLC v. Tibert*, 2004 ND 107, 681 N.W.2d 70; *Tibert v. City of Minto*, 2004 ND 97, 679 N.W.2d 440; *see also Nowling v. BNSF Ry.*, 2002 ND 104, 646 N.W.2d 719. Mark and Sue Tibert and Melvin Tibert owned homes on property adjacent to a grain elevator owned and operated by Minto Grain. *Minto Grain*, 2009 ND 213, ¶ 2, 776 N.W.2d 549. Minto Grain intended to expand its facility to a 110–car unit train load-out facility. *Id.* at ¶ 3. As part of the expansion, Minto Grain acquired a portion of BNSF Railway's right-of-way on Kilowatt Drive, a roadway abutting and providing access to the Tiberts' properties. *Id.* The Tiberts alleged the proposed expansion would have affected their use of and access to their property.

[¶ 3]   The Tiberts had various homeowner's policies and umbrella policies, which included personal injury liability endorsements, with Nodak. In 2004, Minto Grain brought an action against the Tiberts, alleging civil conspiracy, wrongful interference with business, tortious interference with contract, nuisance, trespass, and abuse of process. *Id.* at ¶ 4. The Tiberts delivered the complaint to Nodak.

Nodak denied it had a duty to indemnify or defend the Tiberts under the policies.

[¶ 4]   The Tiberts hired their own attorney to defend them in Minto Grain's lawsuit. After Minto Grain's civil conspiracy and abuse of process claims were dismissed by partial summary judgment, the remaining claims were tried to a jury. The jury returned a special verdict in favor of Minto Grain, finding that all four of the Tiberts, acting in concert, had unlawfully interfered with Minto Grain's business, intentionally interfered with contract, and created a nuisance, and that Mark, Sue, and Melvin Tibert, acting in concert, had committed trespass. The jury held the Tiberts jointly and severally liable for damages in the amount of $455,000, but limited damages against William Tibert to $305,000. *Id.* at ¶ 5. The judgment was affirmed on appeal. *Id.* at ¶ 54. The Tiberts have paid and fully satisfied the judgment.

[¶ 5]   The Tiberts brought this declaratory judgment action against Nodak, seeking indemnification and recovery of their costs of defending the underlying action. The district court granted Nodak's motion for summary judgment, holding the jury's finding that the Tiberts had acted in concert was res judicata on the issue of whether their conduct was intentional, and coverage was therefore barred by the intentional acts exclusions in the various policies and by N.D.C.C. § 26.1–32–04. The district court concluded Nodak had no duty to defend or indemnify the Tiberts, and judgment was entered dismissing the action.

[¶ 6]   The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. §§ 27–05–06 and 32–23–01. The appeal was timely under N.D.R.App.P. 4(a). This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. §§ 28–27–01 and 32–23–07.

## II

[¶ 7] The Tiberts contend the district court erred in concluding Nodak had no duty to indemnify them for Minto Grain's damages.

## A

[¶ 8] We have outlined the standard for reviewing a summary judgment:

Summary judgment is a procedural device for the prompt resolution of a controversy on the merits without a trial if there are no genuine issues of material fact or inferences that can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law. A party moving for summary judgment has the burden of showing there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. In determining whether summary judgment was appropriately granted, we must view the evidence in the light most favorable to the party opposing the motion, and that party will be given the benefit of all favorable inferences which can reasonably be drawn from the record. On appeal, this Court decides whether the information available to the district court precluded the existence of a genuine issue of material fact and entitled the moving party to judgment as a matter of law. Whether the district court properly granted summary judgment is a question of law which we review de novo on the entire record.

*Myaer v. Nodak Mut. Ins. Co.*, 2012 ND 21, ¶ 9, 812 N.W.2d 345 (quoting *Riverwood Commercial Park, LLC v. Standard Oil Co., Inc.*, 2011 ND 95, ¶ 6, 797 N.W.2d 770).

[¶ 9] Interpretation of an insurance contract is a question of law fully reviewable on appeal. *Wisness v. Nodak Mut. Ins. Co.*, 2011 ND 197, ¶ 5, 806 N.W.2d 146; *Grinnell Mut. Reinsurance Co. v. Thies*, 2008 ND 164, ¶ 7, 755 N.W.2d 852; *State v. North Dakota State Univ.*, 2005 ND 75, ¶ 12, 694 N.W.2d 225. We independently examine and construe the insurance contract to determine whether there is coverage. *Thies*, at ¶ 7. We summarized our standards for construing an insurance contract in *Thies*, at ¶ 7 (quoting *North Dakota State Univ.*, at ¶ 12):

Our goal when interpreting insurance policies, as when construing other contracts, is to give effect to the mutual intention of the parties as it existed at the time of contracting. We look first to the language of the insurance contract, and if the policy language is clear on its face, there is no room for construction. "If coverage hinges on an undefined term, we apply the plain, ordinary meaning of the term in interpreting the contract." While we regard insurance policies as adhesion contracts and resolve ambiguities in favor of the insured, we will not rewrite a contract to impose liability on an insurer if the policy unambiguously precludes coverage. We will not strain the definition of an undefined term to provide coverage for the insured. We construe insurance contracts as a whole to give meaning and effect to each clause, if possible. The whole of a contract is to be taken together to give effect to every part, and each clause is to help interpret the others.

Exclusions from coverage in an insurance contract must be clear and explicit and are strictly construed against the insurer. *Wisness*, at ¶ 13; *Schleuter v. Northern Plains Ins. Co., Inc.*, 2009 ND 171, ¶ 8, 772 N.W.2d 879; *North Dakota State Univ.*, at ¶ 13. Although exclusionary provisions must be strictly construed, we will not rewrite a contract to impose liability on the insurer if the policy unambiguously precludes coverage. *Wisness*, at ¶ 13;

*Schleuter,* at ¶ 8; *North Dakota State Univ.,* at ¶ 13.

[¶ 10]   The interpretation of a statute is a question of law, which is fully reviewable on appeal. *In re T.H.,* 2012 ND 38, ¶ 22, 812 N.W.2d 373; *Grinnell Mut. Reinsurance Co. v. Thompson,* 2010 ND 22, ¶ 9, 778 N.W.2d 526.

B

[¶ 11]   The Tiberts had been insured by Nodak for many years under numerous policies.  Mark and Sue, Melvin, and William Tibert had separate homeowners' policies on their respective properties, and had additionally purchased personal injury liability endorsements on their respective policies.  The personal injury endorsements each included intentional acts exclusions.  They also had purchased separate umbrella policies that included personal injury liability coverage.

[¶ 12]   Although the operative language setting out coverage and exclusions in the numerous policies varies to some degree, the parties do not rely upon the variations in language when arguing for or against coverage.  Rather, each side has taken an all-or-nothing approach: the Tiberts claim there is coverage under all of the policies, and Nodak claims coverage under all of the policies is barred by the intentional acts exclusions or public policy.  We agree with the parties that the differences in the language of the respective policies do not affect the ultimate decision in this case.

[¶ 13]   For purposes of illustration, one of the relevant personal injury liability endorsements provided:

A.   Personal Injury Liability

"Personal Injury" means injury, other than bodily injury, arising out of one or more of the following offenses:

1.   false arrest, detention or imprisonment;

2.   malicious prosecution;

3.   the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, by or on behalf of its owner, landlord or lessor;

4.   oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;  or

5.   oral or written publication of material that violates a person's right of privacy.

B.   Section II Exclusions do not apply to personal injury.

Personal injury insurance does not apply to:

. . . .

2.   injury caused by a violation of a penal law or ordinance committed by or with the knowledge or consent of any Insured;

. . . .

7.   personal injury caused intentionally by you or any Insured. . . .

[¶ 14]   Again as an example, one of the umbrella policies provided the following personal injury liability coverage:

"Personal injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:

a.   False arrest, detention or imprisonment, or malicious prosecution;

b.   Libel, slander or defamation of character;  or

c.   Invasion of the right of private occupancy, wrongful eviction or wrongful entry.

This umbrella policy did not include an intentional acts exclusion applicable to "personal injury."

■ [¶ 15] Two North Dakota statutes, N.D.C.C. §§ 9–08–02 and 26.1–32–04, also directly affect the determination whether there is coverage in this case. Section 9–08–02, N.D.C.C., provides:

All contracts which have for their object, directly or indirectly, the exempting of anyone from responsibility for that person's own fraud or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law.

Similarly, N.D.C.C. § 26.1–32–04 provides:

An insurer is not liable for a loss caused by the willful act of the insured, but the insurer is not exonerated by the negligence of the insured or of the insured's agents or others.

These statutes "manifest a public policy precluding an insured from being indemnified for losses caused by the insured's intentional or willful conduct." *Ohio Cas. Ins. Co. v. Clark,* 1998 ND 153, ¶ 17, 583 N.W.2d 377 (quoting *Nodak Mut. Ins. Co. v. Heim,* 1997 ND 36, ¶ 21, 559 N.W.2d 846).

[¶ 16] Among the multitude of factual allegations in the underlying lawsuit, Minto Grain alleged that one or more of the Tiberts had threatened and harassed contractors and surveyors working for Minto Grain; interfered with loading of grain cars, including shining a laser beam at employees; parked their vehicles on Minto Grain's property and filed complaints with law enforcement when their vehicles were towed; removed survey stakes; threatened to plug culverts to pressure the city to stop Minto Grain's expansion plans; threatened legal action against contractors and surveyors working for Minto Grain; attempted to purchase a bridge to prohibit trucks from accessing Minto Grain's property; accused William Slominski of illegal activity; filed complaints alleging the city had held secret meetings and was in collu-

sion with Minto Grain; trespassed on Minto Grain's property; asked the city not to grant Minto Grain a permit for temporary grain storage bins; interfered with Minto Grain's customers and threatened not to do business with them if they did business with Minto Grain; and sued Minto Grain, alleging damages from runoff of ground sterilant. Minto Grain alleged that these actions resulted in injury and monetary damages to its business.

[¶ 17] The Tiberts' primary argument on appeal is that the intentional acts exclusions in the various policies and the North Dakota statutes prohibiting insurance coverage for intentional or willful injuries or acts require proof that the insureds intended the specific harm resulting from their conduct. The Tiberts argue that any acts they committed were done to protect their interests in their respective properties, and they did not intend to harm Minto Grain or its business. The Tiberts contend that in order to deny coverage, Nodak had to prove that the Tiberts not only intended to commit the alleged acts, but that they also intended to cause the specific resulting harm and injury to Minto Grain.

■ [¶ 18] This Court, however, has expressly rejected that argument and has repeatedly held that an intentional acts exclusion precludes coverage for the natural and probable consequences of an intentional act. *Ohio Cas. Ins. Co. v. Horner,* 1998 ND 168, ¶ 16, 583 N.W.2d 804; *Clark,* 1998 ND 153, ¶ 30, 583 N.W.2d 377; *National Farmers Union Prop. & Cas. Co. v. Kovash,* 452 N.W.2d 307, 311 (N.D.1990); *Hins v. Heer,* 259 N.W.2d 38, 40 (N.D. 1977). This Court has summarized its application of the "classic tort doctrine" to determine whether an intentional acts exclusion in an insurance policy or the statutory public policy prohibition against indemnification for intentional or willful acts

will preclude coverage for particular conduct:

> Our decisions have followed the "classic tort doctrine" for determining an insured's intent for purposes of an exclusion for intentional acts. Annot., *Construction and application of provision of liability insurance policy expressly excluding injuries intended or expected by insured,* 31 A.L.R.4th 957, 991 § 5[d] (1984). In *Hins v. Heer,* 259 N.W.2d 38 (N.D.1977), this Court held an insurer did not have a duty to defend an insured who had been found liable for damages for injuries resulting from the insured's willful, wanton physical assault of a person. In construing a substantively identical intentional acts exclusion clause, we quoted with approval from *Rankin v. Farmers Elevator Mutual Insurance Co.,* 393 F.2d 718, 720 (10th Cir.1968): " 'Where an intentional act results in injuries which are the natural and probable consequences of the act, the injuries, as well as the act, are intentional.' " *Hins,* 259 N.W.2d at 40. We have followed the *Hins* interpretation of these intentional acts exclusions ever since.

*Horner,* at ¶ 16. Thus, when an insured has committed an intentional wrongful act, a court may infer that the insured also intended to cause any injuries which were the "natural and probable consequences" of the act.

[¶ 19] We wish to clarify, however, that the phrase "natural and probable consequences," when used in the context of an intentional acts exclusion or when considering the statutory prohibition on coverage for intentional or willful acts, is far more limited than the broad general tort concept of foreseeability. Other courts have cautioned that a literal interpretation of "natural and probable consequences" could unintentionally create an expansive exclusion that would effectively swallow the coverage intended for negligently caused injuries:

> A closely related problem with the natural and probable consequences approach for determining whether an injury was intentionally caused is its confusion with the concept of foreseeability: "[n]atural and probable consequences are those which human foresight can anticipate" or "should have been foreseen." [*Rowell v. City of Wichita,*] 162 Kan. [294,] at 302, 176 P.2d 590 [ (1947) ]. If foreseeability of injury alone were enough to activate the policy exclusion, then many acts of mere negligence would be excluded. We should hesitate to read "intentional act exclusion" clauses to exclude both intentional and negligent acts, or else virtually all insurance coverage would be excluded. *Cf. Continental Western Ins. Co. v. Toal,* 309 Minn. 169, 176, 244 N.W.2d 121 (1976) (Defining exclusionary clause's "expected injury" as a foreseeable injury would have the effect of unduly limiting coverage under a liability insurance policy since foreseeability is generally an essential element in establishing liability. Foreseeability could include an injury resulting from simple negligence. Therefore, " 'an expected injury' as that term is used in an insurance exclusionary clause cannot be equated with foreseeable injury."); *cf. Poston v. U.S. Fidelity & Guarantee Co.,* 107 Wis.2d 215, 222, 320 N.W.2d 9, 13 (1982) (same) (If foreseeability of injury alone were enough to activate the policy exclusion, then many acts of mere negligence would be excluded. To so broaden the exclusion to exclude foreseeable injuries is unjustified.).

> As one commentator has elaborated upon the problems:

"In a certain sense, all acts are intentional, save perhaps for involuntary muscle spasms." Thus, if taken literally, a proscription against coverage for *the natural and probable consequences of the insured's acts* would eliminate almost all insurance coverage, because an 'act' (inadvertently leaving a candle burning at a neighbor's home while house-sitting) can be negligent, and the 'natural and probable consequences' (the resulting house fire) are just what insurance is supposed to protect against.... (Emphasis added.) Dykes, *Occurrences, Accidents, and Expectations: A Primer of These (and Some Other) Insurance–Law Concepts*, 2003 Utah L.Rev. 831, 846–47 (2003).

*Thomas v. Benchmark Ins. Co.*, 285 Kan. 918, 179 P.3d 421, 428–29 (2008).

[¶ 20] Recognizing that our adoption of the "natural and probable consequences" test was derived from Kansas law, *see Hins*, 259 N.W.2d at 40 (quoting *Rankin v. Farmers Elevator Mut. Ins. Co.*, 393 F.2d 718, 720 (10th Cir.1968) (applying Kansas law)), we agree with the interpretation of the Supreme Court of Kansas, which has narrowed its "natural and probable consequences" test for inferring intent to injure: "Intent to cause the injury or damage can be actual or it can be inferred from the nature of the act when the consequences are substantially certain to result from the act." *Thomas*, 179 P.3d at 431; *see also Bruner v. Heritage Cos.*, 225 Wis.2d 728, 593 N.W.2d 814, 819 (Wis. Ct.App.1999) (a person is presumed to intend the natural and probable consequences of his acts voluntarily and knowingly performed, and the court may infer intent when a reasonable person would believe that a particular result was substantially certain to follow). Under this formulation of the test, it is not enough for the insurer to show that the act was intentional and the result was foreseeable. In order to infer intent to injure, the insurer must show the act was done intentionally and was of such a character that harmful consequences "are substantially certain to result from the act." *Thomas*, at 431; *see also Bruner*, at 819.

[¶ 21] In this case, the district court concluded that the Tiberts' actions established intent to injure Minto Grain as a matter of law because the jury's findings in the underlying action that the Tiberts had acted in concert in committing the tortious acts were res judicata on the question of their intent to injure Minto Grain.

[¶ 22] Under N.D.C.C. § 32–03.2–02, tortfeasors who act in concert are jointly liable for all damages attributable to their combined percentage of fault. This Court has concluded the "in concert" doctrine is

> reserved for application to facts which manifest *a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result.... "[T]he mere presence of the particular defendant at the commission of the wrong, or his failure to object to it, is not enough to charge him with responsibility."*

*Hurt v. Freeland*, 1999 ND 12, ¶ 23, 589 N.W.2d 551 (quoting *Olson v. Ische*, 343 N.W.2d 284, 289 (Minn.1984)). Thus, "[t]o constitute a concerted action, the plaintiffs needed to present evidence of a common plan to commit a tortious act, the participants knew of the plan and its purpose, and the participants took substantial affirmative steps to encourage the achievement of the result." *Ward v. Bullis*, 2008 ND 80, ¶ 31, 748 N.W.2d 397; *see also Schneider v. Schaaf*, 1999 ND 235, ¶ 23, 603 N.W.2d 869. This Court has expressly refused "to broadly construe the 'in con-

cert' language of N.D.C.C. § 32–03.2–02 to include concurrent negligence." *Reed v. University of North Dakota,* 1999 ND 25, ¶ 34, 589 N.W.2d 880. Rather, a person will be deemed to act in concert only "when he acts with another to bring about some preconceived result." *Hurt,* at ¶ 22 (quoting *Black's Law Dictionary* 289 (6th ed.1990)).

[¶ 23] The jury in the underlying lawsuit was specifically instructed on acting in concert:

> Two or more persons who, in pursing a common plan or design to commit a wrongful act, actively take part in the act or aid or encourage the act or ratifies or adopts the act for their benefit are "acting in concert." Mere knowledge by each person of what the other is doing is insufficient to make each liable for the acts of the other, and mere presence at the commission of the wrong or failure to object to it, is similarly insufficient. To find that two or more persons "acted in concert" there must be an express or tacit agreement to commit the wrongful act.

The jury, by special verdict, found that all four of the Tiberts, acting in concert, had unlawfully interfered with Minto Grain's business, intentionally interfered with contract, and created a nuisance, and that Mark, Sue, and Melvin Tibert, acting in concert, had committed trespass. The jury did not find that William Tibert had committed trespass. Therefore, the Tiberts were found to be acting in concert in committing each of the torts for which they were held liable to Minto Grain.

[¶ 24] We agree with the district court's conclusion that the jury's findings that the Tiberts acted in concert are res judicata on the question of intent in this case. The jury's findings constitute a judicial determination that the Tiberts had agreed to pursue a common plan to commit wrongful acts and that they knew of the common plan and its purpose. Furthermore, the findings that they acted in concert establish their conduct was more than mere concurrent negligence, but was intended to bring about a preconceived result. We conclude that a tortfeasor who acted in concert with another by agreeing to pursue a common plan to commit wrongful acts, with knowledge of the plan and its purpose, intended the harm and injury caused by the wrongful act. *See Illinois Farmers Ins. Co. v. Preston,* 153 Ill.App.3d 644, 106 Ill.Dec. 552, 505 N.E.2d 1343, 1347 (1987) ("[t]o be in *concert* is defined as 'agreement in a plan, or design; union formed by such agreement,'" and "[s]uch plan or design obviously requires intentional involvement of the conspirator and would thereby plainly fall within the 'intentional acts' exclusion in this insurance policy") (quoting the Oxford Universal Dictionary 361 (1955)); *National Union Fire Ins. Co. v. Bourn,* 441 S.W.2d 592, 596 (Tex.Civ.App.1969) (where prior criminal cases established four defendants acting in concert had committed assault and battery, coverage was barred by intentional acts exclusion); *Bruner,* 593 N.W.2d at 818–19 (where two or more persons acting in concert knowingly commit wrongful acts, intent to harm is implied and coverage is barred by an *intentional acts* exclusion). We therefore conclude Nodak had no duty to indemnify the Tiberts for Minto Grain's damages because coverage was precluded as a matter of law by the intentional acts exclusions in the policies and by public policy as expressed in N.D.C.C. §§ 9–08–02 and 26.1–32–04.

III

[¶ 25] The Tiberts allege that if the intentional acts exclusions in these insurance policies are interpreted to preclude coverage under the circumstances in

this case, the personal injury liability coverage in the policies is rendered illusory. They therefore contend the ambiguity in the policy must be interpreted in their favor and Nodak should be required to indemnify them for the damages paid to Minto Grain.

■ [¶ 26] We find it unnecessary to resolve the issue whether the policy in this case is illusory, because we conclude that even if it is illusory, the Tiberts are not entitled to the remedy they seek. We addressed the effect of illusory policy provisions in *Continental Cas. Co. v. Kinsey*, 499 N.W.2d 574 (N.D.1993). In *Kinsey*, Bjorgen had obtained a judgment against her attorney, Kinsey, for intentional fraud and deceit and was awarded compensatory and punitive damages. Kinsey's malpractice insurer, Continental, brought a declaratory judgment action claiming it had no duty to indemnify. Kinsey's policy expressly provided coverage for punitive damages, but excluded coverage for dishonest, fraudulent, criminal, or malicious conduct. The Court considered the illusory nature of the policy in the context of the statutory public policy against indemnification of a person for injuries caused by intentional or willful acts:

> These two provisions, construed together, quite clearly manifest a public policy of discouraging persons from committing fraud or other willful acts that cause injury to others. These statutes foster that public policy by prohibiting contracts which would exempt a person from being held responsible for the consequences of his wrongful intentional conduct (Section 9–08–02, N.D.C.C.) and by precluding insurers from indemnifying insureds for losses caused by the insured's willful acts (Section 26.1–32–04, N.D.C.C.). However, we do not believe that this legislation was intended to benefit insurance companies by allowing

them to collect premiums for coverage they do not intend to provide. Nor do we believe that the Legislature intended to benefit insureds who cause intentional injury to others, by allowing them to shift to insurance carriers the monetary responsibility for their intentional torts.

*Kinsey*, at 581. We resolved the dilemma by fashioning a remedy which gave effect to the legislative intent by creating potential liability for the insurer while preventing the insured from being exonerated from the consequences of his wrongful acts:

> To give effect to the Legislature's objectives in enacting these laws, we construe and apply them within the factual circumstances of this case, as follows. Continental is obligated, under the express terms of its insurance policy with Kinsey, to pay for the punitive damages awarded to Bjorgen against Kinsey, up to the policy limits. However, Continental may seek indemnity from Kinsey, who is prohibited by these statutes from being either indemnified or exonerated for injury caused by his own fraud or deceit. With this application of our statutes to these facts, Continental is required to meet its contractual obligation to pay for punitive damages awarded against Kinsey, but it has recourse against Kinsey for these payments, because the losses stem from Kinsey's willful fraud and deceit.

*Id.* Thus, when an insurer has created illusory coverage by "giving" but then "taking away" through an intentional acts exclusion, the insurer may be required to pay damages to the injured third party as though there were coverage but has a right to indemnity from its insured. The insured does not, however, have a right to be indemnified and remains ultimately responsible and liable for damages caused by his wrongful conduct.

[¶ 27] Even if the personal injury coverage in this case was found to be illusory, under *Kinsey* the Tiberts are barred from attaining the remedy they seek—indemnification from Nodak. Because the Tiberts have already paid and satisfied the judgment to Minto Grain, the ultimate result envisioned in *Kinsey* has occurred: the injured third party has been fully compensated, and the wrongdoing insured has been held ultimately responsible.

## IV

[¶ 28] The Tiberts contend the district court erred in concluding Nodak did not have a duty to defend them in Minto Grain's action. The district court did not separately address whether Nodak had a duty to defend the Tiberts. The court merely determined that coverage was barred by the intentional acts exclusions and N.D.C.C. § 26.1–32–04 on the basis of the res judicata effect of the jury's findings that the Tiberts had acted in concert, and then summarily concluded Nodak had no duty to defend or indemnify the Tiberts.

[¶ 29] The district court's decision overlooks the vital distinctions between an insurer's duty to defend and its duty to indemnify. The duty to defend and the duty to indemnify are separate and distinct contractual elements. *Hanneman v. Continental W. Ins. Co.*, 1998 ND 46, ¶ 39, 575 N.W.2d 445; *Smith v. American Family Mut. Ins. Co.*, 294 N.W.2d 751, 759 (N.D.1980). "When an insured purchases a contract of insurance, it seeks protection from expenses arising from litigation," and a portion of the premium for liability insurance is paid to provide a defense, separate and apart from the insurer's ultimate duty to indemnify for covered claims. *State Farm Fire & Cas. Co. v. Sigman*, 508 N.W.2d 323, 325 (N.D.1993) (quoting *Olympic S.S. Co., Inc. v. Centennial Ins. Co.*, 117 Wash.2d 37, 811 P.2d

673, 681 (1991)); *see also Johnson v. Center Mut. Ins. Co.*, 529 N.W.2d 568, 572 (N.D.1995).

[¶ 30] An insurer's duty to defend is broader than the duty to indemnify, and is generally determined by the allegations of the injured claimant. *Farmers Union Mut. Ins. Co. v. Decker*, 2005 ND 173, ¶ 14, 704 N.W.2d 857. We have outlined the parameters of an insurer's duty to defend:

> A liability insurer's obligation to defend its insured is ordinarily measured by the terms of the insurance policy and the pleading of the claimant who sues the insured. If the allegations of the claimant's complaint could support recovery upon a risk covered under the insurer's policy, a liability insurer has a duty to defend its insured. We have formulated the duty to defend to require a liability insurer to defend an underlying action against its insured if the allegations in the complaint give rise to potential liability or a possibility of coverage under the insurance policy.

*Schultze v. Continental Ins. Co.*, 2000 ND 209, ¶ 8, 619 N.W.2d 510 (citations omitted); *see also Decker*, at ¶ 14; *Fetch v. Quam*, 2001 ND 48, ¶ 14, 623 N.W.2d 357; *Hart Constr. Co. v. American Family Mut. Ins. Co.*, 514 N.W.2d 384, 389 (N.D. 1994); *Kyllo v. Northland Chem. Co.*, 209 N.W.2d 629, 634 (N.D.1973). When several claims are made against the insured in the underlying action, the insurer has a duty to defend the entire lawsuit if there is potential liability or a possibility of coverage for any one of the claims. *Schultze*, at ¶ 14; *Nodak Mut. Ins. Co. v. Heim*, 1997 ND 36, ¶ 11, 559 N.W.2d 846.

[¶ 31] Any doubt about whether a duty to defend exists must be resolved in favor of the insured. *Schultze*, 2000 ND 209, ¶ 13, 619 N.W.2d 510; *Heim*,

1997 ND 36, ¶ 11, 559 N.W.2d 846; *Hart Constr.*, 514 N.W.2d at 389; *Kyllo*, 209 N.W.2d at 634. Thus, when there is doubt whether the injured party's complaint states facts sufficient to bring the injury within the coverage of the insurance policy, and the claim "may or may not be covered by the policy," the insurer has a duty to defend. *Kyllo*, at 634 (quoting *Hartford Accident & Indem. Co. v. Pacific Indem. Co.*, 249 Cal.App.2d 432, 57 Cal. Rptr. 492, 494 (1967)). Only if there is no possibility of coverage is the insurer relieved of its duty to defend. *See Decker*, 2005 ND 173, ¶ 14, 704 N.W.2d 857; *Fetch*, 2001 ND 48, ¶ 14, 623 N.W.2d 357; *Schultze*, at ¶ 8.

[¶ 32] The Tiberts argue that some of the factual allegations in Minto Grain's complaint could have created liability based upon reckless or negligent conduct, which would not have barred coverage under the intentional acts exclusions or under N.D.C.C. §§ 9–08–02 and 26.1–32–04. Several of the factual allegations raised potential claims based upon defamation or malicious prosecution, offenses covered by the policies and which could be committed through mere negligence or recklessness, without an intent to injure. For example, the jury in the underlying action was instructed that the unlawful interference with business claim could be established by showing the Tiberts had committed defamation or malicious prosecution. The jury was further instructed that defamation and malicious prosecution could be committed by non-intentional actions. Thus, the allegations in the complaint that the Tiberts had accused William Slominski of illegal activity and that they had sued Minto Grain, alleging damages for runoff, could have potentially established defamation or malicious prosecution by proof of conduct that was merely reckless or negligent, not intentional. Under those circumstances, the intentional acts exclusions would not have applied and there was "potential liability or a possibility of coverage under the insurance policy." *Schultze*, 2000 ND 209, ¶ 8, 619 N.W.2d 510.

[¶ 33] On the basis of the claims alleged in Minto Grain's complaint, it would have been possible for the jury to find that the Tiberts were liable on the basis of actions that would not have fallen within the intentional acts exclusions or been barred by N.D.C.C. §§ 9–08–02 and 26.1–32–04. The district court even recognized this fact when it noted in its written order granting Nodak's motion for summary judgment that "if the jury found the Tiberts to have engaged in the tortious acts individually but not 'in concert,' the Tiberts could assert the argument their actions were negligent and coverage may apply." The court further concluded, however, that the jury's finding that the Tiberts had acted in concert was res judicata on the issue of intent and, apparently on the basis of that reasoning, held Nodak had neither the duty to indemnify nor the duty to defend. As previously addressed, however, the duty to defend and the duty to indemnify are two separate and distinct contractual obligations, and are determined by applying different standards. *See Hanneman*, 1998 ND 46, ¶ 39, 575 N.W.2d 445; *Smith*, 294 N.W.2d at 759. The duty to defend focuses upon the allegations in the complaint, whereas the duty to indemnify is generally determined by the actual result in the underlying action.

[¶ 34] Because of these differing standards, the duty to defend and the duty to indemnify are effectively determined by looking at different stages of the underlying lawsuit. The duty to indemnify is premised upon the ultimate resolution of the underlying lawsuit and the actual basis for any liability of the insured. The duty to defend, however, arises as soon as the

insured is sued, and accordingly is determined on the basis of the allegations in the injured claimant's complaint. Because the duty to defend is determined by the allegations in the complaint examined as of the time the complaint was served and the defense was tendered to the insurer, the ultimate result in the case does not affect the duty to defend. *See* 44 Am.Jur.2d *Insurance* § 1400 (2003) ("the insurer's duty to defend arises in instances in which coverage is even arguable ...; the course and outcome of the litigation is irrelevant"). Therefore, resolution of factual issues by the factfinder in the underlying action are not res judicata when determining whether the allegations in the injured party's complaint created potential liability or the possibility of coverage, thereby triggering the duty to defend.

[¶ 35] Our cases which have held a prior judicial determination may be res judicata on an issue affecting the duty to defend are distinguishable. In *Mead v. Farmers Union Mut. Ins. Co.*, 2000 ND 139, 613 N.W.2d 512, the insured shot and killed a police officer and was subsequently found guilty of murder at a criminal trial. The police officer's family brought a wrongful death action, and the insured's liability insurer refused to defend or indemnify. On appeal, this Court concluded the result in the criminal trial was res judicata on the issue of intent, and the insurer had no duty to defend because coverage was barred by the intentional acts exclusion. *Id.* at ¶ 22; *see also Clark*, 1998 ND 153, ¶ 28, 583 N.W.2d 377 (jury's rejection of self-defense in insured's earlier criminal case was res judicata and could not be relitigated in insurer's declaratory judgment action regarding coverage and duty to defend). In those cases, the relevant issues had been determined under the "beyond a reasonable doubt" criminal standard *before* the civil action against the insured was commenced. Thus, the result

of the criminal case was known and the relevant factual issues conclusively determined before the insurer's duty to defend in the civil action arose. Under those circumstances, there was no possibility of coverage and no duty to defend.

[¶ 36] In this case, the district court and Nodak suggest that the jury's finding in the underlying civil suit somehow has a res judicata effect upon the insurer's duty to defend in that same civil case. However, if the allegations pleaded in the complaint viewed at the time of tender include any potential liability or possibility of coverage under the policy, there is a duty to defend, and the insurer cannot simply refuse to provide a defense in the hope that the facts as determined by the factfinder in the underlying lawsuit preclude coverage under a policy exclusion. The insurer is not free to refuse to provide a defense, wait until the case is tried, and then with the benefit of hindsight claim the jury's resolution of disputed factual allegations is res judicata on the issue of duty to defend. The insurer's duty to defend is set by the pleadings and must be determined as of the time the defense it tendered; it is not affected by "the course and outcome of the litigation." 44 Am.Jur.2d *Insurance* § 1400 (2003). An insurer faced with legitimate questions whether the factual allegations in the complaint create a duty to defend has an immediate remedy to resolve the question. The insurer (or the insured) can bring a declaratory judgment action to determine duty to defend before the underlying action is tried. *See* N.D.C.C. § 32–23–06. However, "[w]here a claim potentially may become one which is within the scope of the policy," and the insurer does not avail itself of its right to seek an immediate declaratory judgment under N.D.C.C. § 32–23–06, "the insurance company's refusal to defend at the outset of the contro-

versy is a decision it makes at its own peril." *Prince v. Universal Underwriters Ins. Co.,* 143 N.W.2d 708, 717 (N.D.1966) (quoting *Cadwallader v. New Amsterdam Cas. Co.,* 396 Pa. 582, 152 A.2d 484, 488 (1959)).

[¶ 37] We conclude the district court erred in concluding Nodak had no duty to defend on the basis of res judicata.

[¶ 38] Nodak contends the Tiberts have attempted to "cherry [pick] individual actions of purported negligence and purportedly covered conduct . . . contrary to North Dakota law." Nodak argues, under this Court's holding in *Heim,* 1997 ND 36, 559 N.W.2d 846, there is no coverage and thus no duty to defend when individual unintentional acts "are part of a broader effort to cause harm."

[¶ 39] Nodak has read the holding in *Heim* too broadly. Heim had engaged in a continuing pattern of criminal sexual abuse of his two young nephews and pled guilty to gross sexual imposition and sexual assault. *Id.* at ¶ 5. The nephews then sued Heim for assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and invasion of privacy, alleging Heim had sexually abused them by fondling their genitals and inappropriately touching them. *Id.* at ¶ 6. Heim contended that some of the acts alleged were not intentional but involved only negligent or accidental touching, and were therefore covered under his policy. *Id.* at ¶ 25.

[¶ 40] In response to Heim's argument, this Court first stressed that "[t]he essence of a child molestation case is the gratification of sexual desire, and an intent to harm is inferred from the act." *Id.* at ¶ 26. Addressing a similar California case, *Horace Mann Ins. Co. v. Barbara B.,* 4 Cal.4th 1076, 17 Cal.Rptr.2d 210, 846 P.2d 792 (1993), this Court concluded an insurer had no duty to defend if the negligent acts alleged in the underlying complaint were inextricably linked to a continuing pattern of intentional sexual molestation:

The import of *Barbara B.* is if an insured's alleged negligent acts are inseparably linked and a continuous part of the insured's intentional molestation, the insurer has no duty to defend the insured for any of the intertwined acts. To the extent *Barbara B.* may be read to hold an insurer has a duty to defend an insured's alleged negligent acts that are intertwined with the insured's continuing pattern of intentional molestation, we decline to follow that decision. Instead, we agree with the well-reasoned dissent that "the facts must be viewed in their entirety, not antiseptically separated and microscopically examined." *Barbara B.,* 17 Cal.Rptr.2d 210, 846 P.2d at 803 (Arabian, J., dissenting). We believe logic dictates that if an insured's alleged negligent acts are inextricably linked with a continuous pattern of intentional molestation, an intent to harm is inferred from the insured's alleged negligent acts. We do not hold an insurer never has a duty to defend an insured for totally separate torts allegedly committed against victims of the insured's previous or contemporaneous intentional molestation. If, however, the insured's alleged negligent acts represent a continuing pattern and are inextricably linked with the intentional molestation, we hold the insurer has no duty to defend against those allegations.

This record discloses the allegations of "inadvertent" and "negligent" touching and the intentional molestation in this case represent a continuous pattern of inextricably linked misconduct. In our view, no reasonable person could conclude [Heim's] conduct, consisting of more than fifty claimed inadvertent or negligent touchings all directed towards

his nephews' genitals, was not a continuing pattern of sexual misconduct. Relabeling [Heim's] conduct as inadvertent or negligent does not alter its true nature, nor withstand informed scrutiny. Although framed in terms of negligent infliction of emotional distress and invasion of privacy, the duty to defend does not depend on the nomenclature of the claim. Rather, the focus is on the basis for the injury.

*Heim*, at ¶¶ 30–31 (citations omitted).

[¶ 41] The circumstances presented in *Heim* differ markedly from this case. In *Heim*, the alleged pattern of conduct involved a single individual committing a series of related sexual contacts on two victims. All of the actions were similar in nature and presented an obvious pattern. As the court expressly noted, "no reasonable person could conclude [Heim's] conduct, consisting of more than fifty claimed inadvertent or negligent touchings all directed towards his nephews' genitals, was not a continuing pattern of sexual misconduct," and simply relabeling the "conduct as inadvertent or negligent [did] not alter its true nature, nor withstand informed scrutiny." *Id.* at ¶ 31. Under the circumstances, it strained the bounds of credulity to suggest that an admitted child molester touched his victims' genitals inadvertently more than fifty times during the same time period he was intentionally sexually abusing them. The Court's decision in *Heim* is also premised on the unique nature of sexual abuse cases, with the Court specifically recognizing that "[t]he essence of a child molestation case is the gratification of sexual desire, and an intent to harm is inferred from the act." *Id.* at ¶ 26. Ultimately, the holding in *Heim* was based upon the fact it was simply not reasonably believable that the alleged inadvertent touching was not part of the admitted continuing pattern of sexual abuse.

[¶ 42] The factual allegations in Minto Grain's complaint in the underlying action in this case, by comparison, are not so obviously or inextricably linked to a pattern of intentional conduct. Rather than a single wrongdoer committing markedly similar acts upon two victims, the allegations in this case encompassed multiple wrongdoers committing a wide variety of disparate acts involving numerous additional parties. As previously noted, the allegations in Minto Grain's complaint presented a veritable hodge-podge of facially distinct acts, including threatening or harassing various contractors and surveyors; interference with Minto Grain's employees; parking vehicles on Minto Grain's property; filing complaints with law enforcement; removing survey stakes; threatening to plug culverts; attempting to purchase a bridge; accusing William Slominski of illegal activity; filing complaints with the city; trespassing; challenging Minto Grain's permit for temporary grain storage bins; interfering with Minto Grain's customers; threatening legal action against contractors and surveyors; and suing Minto Grain.

[¶ 43] In contrast to *Heim*, where it was simply unfathomable that the alleged negligent acts were not part of the ongoing pattern of sexual abuse, the acts alleged in this case are not, on their face, unmistakably, inseparably, and inextricably linked and intertwined with a continuing pattern of wrongful conduct. It is conceivable that some of the acts alleged here could have been done unintentionally, recklessly, or negligently, and not as part of an alleged continuous pattern of intentional conduct. *Heim* is therefore distinguishable and does not require the conclusion that Nodak had no duty to defend the Tiberts.

[¶ 44] Because *Heim* does not apply in this case, Nodak had a duty to defend the Tiberts if there was potential liability or a

possibility of coverage for any one of the claims in Minto Grain's complaint. *E.g., Schultze,* 2000 ND 209, ¶ 14, 619 N.W.2d 510. Resolving any doubt about the duty to defend in favor of the insured, *see id.* at ¶ 13; *Hart Constr.,* 514 N.W.2d at 389, we conclude the district court erred in concluding Nodak did not have a duty to defend the Tiberts in Minto Grain's action against them.

V

[¶ 45] We conclude the district court did not err in concluding Nodak did not have a duty to indemnify the Tiberts for the damages paid to Minto Grain, but did err in concluding Nodak did not have a duty to defend the Tiberts in the underlying action. We have considered the remaining issues and arguments raised by the parties and find them to be either unnecessary to our decision or without merit. We affirm that part of the judgment holding there was no duty to indemnify, reverse that part of the judgment holding there was no duty to defend, and remand for further proceedings.

[¶ 46] GERALD W. VANDE WALLE, C.J., ALLAN L. SCHMALENBERGER, S.J., CAROL RONNING KAPSNER and MARY MUEHLEN MARING, JJ., concur.

[¶ 47] The Honorable ALLAN L. SCHMALENBERGER, S.J., sitting in place of CROTHERS, J., disqualified.